Andrew LaPorta [ISB N. 10483]
HEPWORTH HOLZER, LLP
537 W. Bannock Street
P.O. Box 2582
Boise, ID 83702
Telephone: (208) 343-7510
Facsimile: (208) 342-2927
Email: alaporta@hepworthholzer.com

*Counsel for Plaintiff*

[Additional Counsel on Signature Page]

## UNITED STATES DISTRICT COURT
## DISTRICT OF IDAHO

| | |
|---|---|
| ELLEN MAXWELL, derivatively on behalf of MICRON TECHNOLOGY, INC., | |
| Plaintiff, | Case No. 1:25-cv-00092 |
| vs. | |
| SANJAY MEHROTRA, MARK MURPHY, RICHARD M. BEYER, LYNN A. DUGLE, STEVE GOMO, LINNIE HAYNESWORTH, MARY PAT MCCARTHY, ROBERT SWAN, ROBERT E. SWITZ, and MARYANN WRIGHT, | **COMPLAINT AND DEMAND FOR JURY TRIAL** |
| Defendants, | |
| and | |
| MICRON TECHNOLOGY, INC., | |
| Nominal Defendant. | |

## VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Plaintiff Ellen Maxwell ("Plaintiff"), by Plaintiff's undersigned attorneys, derivatively and

on behalf of Nominal Defendant Micron Technology, Inc. ("Micron" or the "Company"), files this

Verified Shareholder Derivative Complaint against Sanjay Mehrotra ("Mehrotra"), Mark Murphy

("Murphy"), Richard M. Beyer ("Beyer"), Lynn A. Dugle ("Dugle"), Steve Gomo ("Gomo"), Linnie Haynesworth ("Haynesworth"), Mary Pat McCarthy ("McCarthy"), Robert Swan ("Swan"), Robert E. Switz ("Switz"), and MaryAnn Wright ("Wright") (collectively, the "Individual Defendants" and together with Micron, the "Defendants") for breaches of their fiduciary duties as directors and/or officers of Micron, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, violations of Sections 14(a), 10(b), and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), and against Defendants Mehrotra and Murphy for contribution under Sections 10(b) and 21D of the Exchange Act. As for Plaintiff's complaint against the Individual Defendants, Plaintiff alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by the Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Micron, legal filings, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a shareholder derivative action that seeks to remedy wrongdoing committed by Micron's current and/or former officers and directors from September 28, 2023 and December 18, 2024, both dates inclusive (the "Relevant Period").

2.      Micron is a technology company that designs, develops, produces, and distributes computer memory and storage products. Among these products are dynamic random access memory ("DRAM"), NAND, NOR, and high-bandwidth memory ("HBM") semiconductor

COMPLAINT AND DEMAND FOR JURY TRIAL - 2

devices.

3.      The Company sells its products in various markets, including markets such as consumer technologies (e.g. personal computers ("PCs"), smartphones, tablets, cameras, etc.) and commercial and industrial applications, such as in manufacturing environments and data centers. Among the products the Company makes for personal consumers are, *inter alia*, NAND flash memory devices, such as solid-state drive ("SSDs") cards and flash drives.

4.      Prior to the start of the Relevant Period, the Company noted in its regulatory filings that "[t]he memory and storage industry environment deteriorated sharply in the fourth quarter of 2022 and throughout 2023 due to weak demand in many end markets combined with global and macroeconomic challenges and lower demand resulting from customer actions to reduce inventory levels[,]" which "led to significant reductions in average selling prices for both DRAM and NAND and bit shipments for DRAM, resulting in declines in revenue across all [of Micron's] business segments and nearly all [of its] end markets."

5.      However, throughout the Relevant Period, the Individual Defendants continuously told investors that the demand for the Company's products, including its consumer-oriented and NAND products, was recovering. Additionally, the Individual Defendants also told investors that the Company was on track to reach record revenues for the 2025 Fiscal Year[1] as a result of the foregoing, as well as, *inter alia*, artificial intelligence ("AI") related tailwinds for its HBM products.

6.      For example, the Relevant Period began on September 28, 2023, one day after the

---

[1] Micron's fiscal year does not mirror with the calendar year but instead is a 52 or 53-week period ending on the Thursday closest to August 31.
For the period between August 30, 2024 and August 28, 2025, the "2025 Fiscal Year."
For the period between September 1, 2023 and August 29, 2024, the "2024 Fiscal Year."
For the period between September 2, 2022 and August 31, 2023, the "2023 Fiscal Year."

COMPLAINT AND DEMAND FOR JURY TRIAL - 3

Company issued a press release after the market closed, detailing the Company's financial and operational results for the fourth quarter and full-year of the 2023 Fiscal Year (the "FY 2023 Earnings Release"). The FY 2023 Earnings Release quoted Defendant Mehrotra, who discussed the Company's recover efforts for the pending 2024 Fiscal Year, stating:

> During fiscal 2023, amid a challenging environment for the memory and storage industry, Micron sustained technology leadership, launched a significant number of leading-edge products, and took decisive actions on supply and cost Our 2023 performance positions us well as a market recovery takes shape in 2024, driven by increasing demand and disciplined supply. We look forward to record industry TAM [total addressable market] revenue in 2025 as AI proliferates from the data center to the edge.

7.      The truth emerged on December 18, 2024, when the Company issued a press release announcing its financial and operational results for the first quarter of the 2025 Fiscal Year (the "Q1 2025 Earnings Release"). The Q1 2025 Earnings Release revealed that, *inter alia*, the Company was reporting a greater-than-expected drop in revenue in NAND flash memory for the first quarter. The Q1 2025 Earnings Release also announced disappointing guidance for the upcoming second quarter, with adjusted earnings falling to between $1.33 and $1.53 per share, far below the $1.92 per share estimate; sales falling to between $7.7 billion and $8.1 billion, with the midpoint far below the $8.99 billion original estimate, and adjusted gross margins falling to between 37.5% and 39.5%, far below the original 41.3% estimate. The Q1 2025 Earnings Release quoted Defendant Mehrotra, who explained the disappointing results as a result of "consumer-oriented markets are weaker in the near term[.]"

8.      On this news, the price per share of the Company's stock fell $16.81, or approximately 16.2%, from a closing price of $103.90 per share on December 18, 2024 to close at $87.09 per share on December 19, 2024.

9.      Analysts reacted negatively to these disclosures. For example, UBS lowered its

price target for Micron from $135 to $125, citing its reasoning as the Company's second quarter "[g]uidance was below even the most bearish bogeys . . . with the company citing ongoing malaise in consumer markets - especially PC - which is hurting the NAND business in particular."

10.    Throughout the Relevant Period, the Individual Defendants made materially false and misleading statements that failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, the Individual Defendants made materially false and misleading statements which failed to disclose, *inter alia*, that: (1) the demand for the Company's products in consumer markets, specifically the demand for the Company's NAND products, had significantly declined; (2) as a result, the amount Company's demand had recovered as was reported to investors was overstated, specifically the demand in consumer markets and for NAND products; (3) the sustainability of demand for these products, as well as the normalization of inventory for these products, was also overstated to investors; (4) the Company failed to maintain internal controls; and (5) the Individual Defendants were improperly interested in increasing their future compensation by seeking shareholder approval of a new equity incentive plan that would increase the number of shares available to Company leadership (the "2025 Equity Incentive Plan"). As a result of the foregoing, the Individual Defendants' statements about the Company's business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

11.    In addition, during the Relevant Period, the Individual Defendants breached their fiduciary duties by causing Micron to repurchase its own stock at prices that were artificially inflated due to the foregoing misrepresentations. Indeed, between June 28, 2024 and August 29, 2024, approximately 3,249,449 shares of Micron common stock were repurchased, costing the Company approximately $303.5 million. As the Company's stock was actually worth only $87.09

COMPLAINT AND DEMAND FOR JURY TRIAL - 5

per share, the price at which it was trading when markets closed on December 19, 2024, the Company overpaid for repurchases of its own stock by approximately $20.5 million in total.

12.     The Individual Defendants further breached their fiduciary duties by failing to correct and/or causing the Company to fail to correct these false and misleading statements and omissions of material facts while Defendant Mehrotra engaged in lucrative insider sales, netting combined total proceeds of approximately $48.6 million.

13.     In light of the Individual Defendants' misconduct—which has subjected the Company, its President and Chief Executive Officer ("CEO"), and its Executive Vice President ("EVP") and Chief Financial Officer ("CFO") to a securities class action lawsuit pending in the United States District Court for the Southern District of Florida (the "Securities Class Actions"), the need to undertake internal investigations, the need to implement adequate internal controls, losses from the waste of corporate assets, and losses due to the unjust enrichment of the Individual Defendants who were improperly overcompensated by the Company and/or who benefitted from the wrongdoing alleged herein—the Company will have to expend many millions of dollars. The Company has been substantially damaged as a result of the Individual Defendants' knowing or highly reckless breaches of fiduciary duty and other misconduct.

14.     In light of the breaches of fiduciary duty engaged in by the Individual Defendants, most of whom are the Company's current directors, of the collective engagement in fraud and misconduct by the Company's directors, of the substantial likelihood of the directors' liability in this derivative action, of Defendants Mehrotra's and Murphy's liability in the Securities Class Action, and of their not being disinterested and/or independent directors, a majority of the Company's Board of Directors (the "Board") cannot consider a demand to commence litigation against themselves on behalf of the Company with the requisite level of disinterestedness and

COMPLAINT AND DEMAND FOR JURY TRIAL - 6

independence.

## JURISDICTION AND VENUE

15.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 14(a) of the Exchange Act (15 U.S.C. § 78n(a)(1)), Rule 14a-9 of the Exchange Act (17 C.F.R. § 240.14a-9), Sections 10(b) and 20(a) of the Exchange Act (15. U.S.C. § 78j(b), 78t(a) and 78t-1), SEC Rule 10b-5 (17 C.F.R. §240.10b-5) promulgated thereunder, and Section 21D of the Exchange Act (15 U.S.C. § 78u-4(f)). Plaintiff's claims also raise a federal question pertaining to the claims made in the Securities Class Action based on violations of the Exchange Act.

16.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

17.     This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

18.     Venue is proper in this District because the alleged misstatements and wrongs complained of herein entered this District, the Defendants have conducted business in this District, and Defendants' actions have had an effect in this District.

## PARTIES

### Plaintiff

19.     Plaintiff is a current shareholder of Micron. Plaintiff has continuously held Micron common stock since first purchasing shares on June 28, 2021.

### Nominal Defendant Micron

20.     Micron is a Delaware corporation with principal executive offices at 8000 S. Federal Way, Boise, Idaho 83716. Micron's common stock trades on The Nasdaq Global Market ("NASDAQ") under the ticker symbol "MU."

COMPLAINT AND DEMAND FOR JURY TRIAL - 7

**Defendant Mehrotra**

21.     Defendant Mehrotra has served as the Company's President and CEO and as a director since May 2017, and as the Chairman of the Board since January 2025. He also serves as a member of the Finance Committee.

22.     During the Relevant Period, while the Company's stock price was artificially inflated and before the scheme was exposed, Defendant Mehrotra made the following sales of Company common stock:

| Date | Number of Shares | Avg. Price/Share | Proceeds |
|---|---|---|---|
| January 23, 2024 | 7,000 | $87.89 | $615,195 |
| January 25, 2024 | 45,000 | $90.00 | $4,050,000 |
| January 30, 2024 | 7,000 | $87.45 | $612,150 |
| February 27, 2024 | 7,000 | $91.63 | $641,410 |
| March 5, 2024 | 7,000 | $94.30 | $660,100 |
| March 8, 2024 | 45,000 | $100.00 | $4,500,000 |
| March 12, 2024 | 7,000 | $95.62 | $669,361 |
| March 19, 2024 | 7,000 | $92.80 | $649,600 |
| March 21, 2024 | 45,000 | $113.38 | $5,102,100 |
| March 25, 2024 | 45,000 | $120.00 | $5,400,000 |
| March 26, 2024 | 7,000 | $120.78 | $845,446 |
| April 2, 2024 | 7,000 | $122.34 | $856,415 |
| April 4, 2024 | 45,000 | $130.00 | $5,850,000 |
| April 9, 2024 | 7,000 | $123.69 | $865,795 |
| April 16, 2024 | 7,000 | $120.51 | $843,570 |
| April 23, 2024 | 7,000 | $111.41 | $779,870 |
| April 30, 2024 | 7,000 | $115.09 | $805,665 |
| May 7, 2024 | 7,000 | $120.28 | $841,995 |
| May 14, 2024 | 7,000 | $122.92 | $860,405 |
| May 21, 2024 | 7,000 | $126.37 | $884,611 |
| May 29, 2024 | 7,000 | $131.51 | $920,591 |
| June 4, 2024 | 7,000 | $126.58 | $886,095 |
| June 11, 2024 | 7,000 | $134.38 | $940,681 |
| June 12, 2024 | 30,000 | $140.00 | $4,200,000 |
| June 18, 2024 | 34,284 | $154.06 | $5,281,621 |

Thus, in total, before the fraud was exposed, he sold 415,284 shares of Company common stock on inside information, for which he received approximately $48.6 million in proceeds. His insider

sales, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed, demonstrate his motive in facilitating and participating in the scheme.

23.    The Schedule 14A the Company filed with the SEC on November 26, 2024 (the "2024 Proxy Statement") stated the following about Defendant Mehrotra:

> Mr. Mehrotra has more than 40 years of experience in the semiconductor memory industry, and as a co-founder of SanDisk, he offers a unique perspective on the industry and has significant senior leadership and technological expertise. In addition, Mr. Mehrotra's experience provides our Board expertise in finance, corporate development, corporate governance, and business strategy, all of which are critical to achieving our strategic objectives. We believe these experiences, qualifications, attributes, and skills qualify Mr. Mehrotra to serve as a member of our Board.

**Defendant Murphy**

24.    Defendant Murphy has served as the Company's EVP and CFO since April 2022.

25.    The 2024 Proxy Statement stated the following about Defendant Murphy:

> Mr. Murphy, our Executive Vice President and Chief Financial Officer, has more than 25 years of experience in executive leadership and finance roles, primarily for businesses in semiconductor materials, semiconductor capital equipment, and semiconductor fabrication and assembly and test. He has successfully led large-scale finance organizations through industry cycles. He is a veteran of the U.S. Marine Corps.

**Defendant Beyer**

26.    Defendant Beyer has served as a Company director since 2013. He also serves as the Chair of the Compensation Committee and as a member of the Governance and Sustainability Committee and the Security Committee.

27.    The 2024 Proxy Statement stated the following about Defendant Beyer:

> Mr. Beyer's experience as the chief executive officer and a director at leading technology companies provides our Board expertise in the technology industry and also in corporate strategy, financial management, operations, marketing, and research and development, all of which are critical to achieving our strategic

objectives. We believe these experiences, qualifications, attributes, and skills qualify Mr. Beyer to serve as a member of our Board.

**Defendant Dugle**

28.     Defendant Dugle has served as a Company director since 2020, and as the Lead Independent Director since January 2025. She also serves as a member of the Governance and Sustainability Committee and the Security Committee.

29.     The 2024 Proxy Statement stated the following about Defendant Dugle:

Ms. Dugle's experience as chairman and chief executive officer of a public engineering services firm and senior officer of a leading public technology company provides our Board expertise in information, technology, cybersecurity, corporate strategy, operations, and research and development, all of which are critical to achieving our strategic objectives. We believe these experiences, qualifications, attributes, and skills qualify Ms. Dugle to serve as a member of our Board.

**Defendant Gomo**

30.     Defendant Gomo has served as a Company director since 2018. He also serves as the Chair of the Finance Committee and as a member of the Audit Committee.

31.     The 2024 Proxy Statement stated the following about Defendant Gomo:

Mr. Gomo's experience as the chief financial officer of a public technology company provides our Board expertise in the technology industry, particularly in the areas of finance, accounting, treasury, investor relations, and securities, which contribute valuable insights and perspectives to our business and operations. We believe these experiences, qualifications, attributes, and skills qualify Mr. Gomo to serve as a member of our Board.

**Defendant Haynesworth**

32.     Defendant Marcus served as a Company director since 2021. She also serves as the Chair of the Security Committee and as a member of the Audit Committee.

33.     The 2024 Proxy Statement stated the following about Defendant Haynesworth:

Ms. Haynesworth's experience as the sector vice president and general manager of a public defense and space company provides our Board expertise in technology integration, cybersecurity (including a Certificate in Cybersecurity Oversight),

enterprise strategy, risk management, and large complex system development, delivery, and deployment, and contributes valuable insights and perspectives to our business and operations. Additionally, Ms. Haynesworth became a Member of the Defense Business Board of the United States Department of Defense in November 2021. We believe these experiences, qualifications, attributes, and skills qualify Ms. Haynesworth to serve as a member of our Board.

**Defendant McCarthy**

34.    Defendant McCarthy has served as a Company director since 2018. She also serves as Chair of the Audit Committee and as a member of the Finance Committee.

35.    The 2024 Proxy Statement stated the following about Defendant McCarthy:

Ms. McCarthy's experience advising numerous companies on financial and accounting matters as a Certified Public Accountant (ret.) provides our Board deep technical expertise in financial and accounting matters, and contributes valuable insights and perspectives to our business and operations. We believe these experiences, qualifications, attributes, and skills qualify Ms. McCarthy to serve as a member of our Board.

**Defendant Swan**

36.    Defendant Swan has served as a Company director since March 2024. He also serves as a member of the Audit Committee and the Finance Committee.

37.    The 2024 Proxy Statement stated the following about Defendant Swan:

Mr. Swan's experience as a former CEO and CFO of public technology companies in the semiconductor memory industry, including Intel, provides our Board expertise in our industry and technology as well as finance, business development, manufacturing, operations, corporate governance and information security expertise. We believe these experiences, qualifications, attributes, and skills qualify Mr. Swan to serve as a member of our Board.

**Defendant Switz**

38.    Defendant Switz served as a Company director from April 2006, and as the Chairman of the Company's Board from 2012, until retiring in January 2025. During his time on the Board, Defendant Switz also served as a member of the Compensation Committee and the Governance and Sustainability Committee.

COMPLAINT AND DEMAND FOR JURY TRIAL - 11

39.     The 2024 Proxy Statement stated the following about Defendant Switz:

Appointed Chair of Micron's Board in 2012, Mr. Switz's experience as Chief Executive Officer and Chairman of a leading technology company and history and leadership on Micron's Board provide the Board expertise in the technology industry as well as international business operations, finance, corporate development, corporate governance, and management, all of which are critical to achieving our strategic objectives. We believe these experiences, qualifications, attributes, and skills qualify Mr. Switz to serve as a member of our Board.

**Defendant Wright**

40.     Defendant Wright has served as a Company director since 2019. She also serves as Chair of the Governance and Sustainability Committee and as a member of the Compensation Committee.

41.     The 2024 Proxy Statement stated the following about Defendant Wright:

Ms. Wright's extensive experience in, and knowledge of, the automotive industry (OEM and Tier 1 supplier), public board experience and her expertise in vehicle, advance powertrain, and energy storage system technologies, provide our Board expertise in the technology industry as well as business operations, finance, corporate development, corporate governance, and management, all of which are critical to achieving our strategic objectives. We believe these experiences, qualifications, attributes, and skills qualify Ms. Wright to serve as a member of our Board.

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

42.     By reason of their positions as officers, directors, and/or fiduciaries of Micron and because of their ability to control the business and corporate affairs of Micron, the Individual Defendants owed Micron and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Micron in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of Micron and its shareholders so as to benefit all shareholders equally.

43.     Each director and officer of the Company owes to Micron and its shareholders the

fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

44.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of Micron, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

45.     To discharge their duties, the officers and directors of Micron were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

46.     Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of Micron, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company. The conduct of the Individual Defendants who were also officers and directors of the Company has been ratified by the remaining Individual Defendants who collectively comprised a majority of Micron's Board at all relevant times.

47.     As senior executive officers and/or directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NASDAQ, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition,

COMPLAINT AND DEMAND FOR JURY TRIAL - 13

performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, including the dissemination of false information regarding the Company's business, prospects, and operations, and had a duty to cause the Company to disclose in its regulatory filings with the SEC all those facts described in this complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful and accurate information. Further, they had a duty to ensure the Company remained in compliance with all applicable laws.

48.    To discharge their duties, the officers and directors of Micron were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties, the officers and directors of Micron were required to, among other things:

(a)    ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware, Idaho, and the United States, and pursuant to Micron's own Code of Business Conduct and Ethics (the "Code of Conduct");

(b)    conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)    remain informed as to how Micron conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d)    establish and maintain systematic and accurate records and reports of the business and internal affairs of Micron and procedures for the reporting of the business and internal

affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e)    maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that Micron's operations would comply with all applicable laws and Micron's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f)    exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g)    refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h)    examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

49.    Each of the Individual Defendants further owed to Micron and the shareholders the duty of loyalty requiring that each favor Micron's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence or knowledge of the affairs of the Company to gain personal advantage.

50.    At all times relevant hereto, the Individual Defendants were the agents of each other and of Micron and were at all times acting within the course and scope of such agency.

51.    Because of their advisory, executive, managerial, directorial, and controlling positions with Micron, each of the Individual Defendants had access to adverse, non-public

information about the Company.

52.    The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Micron.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

53.    In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

54.    The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct was, among other things, to: (i) facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, gross mismanagement, abuse of control, and violations of the Exchange Act; (ii) conceal adverse information concerning the Company's operations, financial condition, legal compliance, future business prospects and internal controls; and (iii) artificially inflate the Company's stock price.

55.    The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company purposefully or recklessly to conceal material facts, fail to correct such misrepresentations, and violate applicable laws. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants who is a director of Micron was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or

common course of conduct complained of herein.

56.    Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein.  In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or substantially assisted in the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

57.    At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Micron and was at all times acting within the course and scope of such agency.

## MICRON'S CODE OF CONDUCT

58.    Micron's Code of Conduct states that it "applies to everyone who works on Micron's behalf worldwide, including team members (employees, officers and directors) and temporary workers." It further states that: "we must uphold our responsibility to follow all laws and regulations that apply to the work we do and to our location. We never violate any law — no matter how small."

59.    In a section titled "Acting With Integrity for Our Company," under a subheading titled "Confidential Information," the Code of Conduct states the following, in relevant part:

> Micron's intellectual property (IP) is one of its most valuable assets. IP includes Micron's patents, copyrights, trademarks, trade secrets and other confidential and proprietary information. Generally, this means that any information that has not been approved for release to the public should be considered confidential and should be handled in accordance with Micron's Confidential and Information Classification Policy available on our global policy site (alias: policy/).

60.    In the same section, under a subheading titled "Conflicts of interest," the Code of Conduct states the following, in relevant part:

COMPLAINT AND DEMAND FOR JURY TRIAL - 17

We are always responsible for acting in the best interests of our Company. To uphold our reputation for integrity, we must be alert to any situations that may create a conflict of interest. A conflict of interest arises when we have personal or private interests (financial or otherwise) that could — or could be perceived to — interfere with our duty to act in Micron's best interests. Conflicts can also arise when our personal interests test our objectivity or our loyalty to Micron, interfere with our work performance or compete with Micron's interests.

It is not possible to describe every situation that could give rise to a conflict of interest. However, some of the more common conflicts of interest are outlined below.

61.    In a section titled "Acting with Integrity for Our Investors," under the subheading

"Books and Records," the Code of Conduct states the following, in relevant part:

We all play a role in ensuring the integrity of our financial books, records and disclosures. Whatever information you record for our Company — from hours worked to product inventory, travel expenses, tax records or accounting — you must help ensure that the business information we report is accurate, complete and timely.

\* \* \*

The information we record helps our Company plan for the future. It also informs the financial data we report to shareholders and regulators. To make sure our Company can plan correctly and that our shareholders and regulators (including taxing authorities) have accurate information, our books and records — whether paper or electronic — must always be complete and honest. They must fairly reflect our business assets, liabilities, expenses and revenue. We all have a duty to maintain our books and records in accordance with U.S. Generally Accepted Accounting Principles (GAAP) and any other regulatory requirements that apply to a multinational, publicly traded company. We also have a duty not to perform, and not to facilitate others in performing, any act of fraud or tax evasion.

62.    In the same section, under the subheading "Records Management," the Code of

Conduct states the following, in relevant part:

In addition to creating honest, accurate financial records, we must also manage and retain our Company's records according to our Records Management Policy. Records are vital to fulfilling our business needs and meeting regulatory requirements. Never destroy them in violation of the policy.

If certain documents or records may be needed for an investigation, audit or potential lawsuit, they may be placed under a legal hold. If a record is subject to a

legal hold, we must not alter, damage or destroy the record until we are instructed that the hold has been lifted — regardless of our usual retention schedules.

We are also firmly committed to preventing and detecting any act of fraud. Generally speaking, fraud is intentionally concealing facts to deceive or mislead others. Among other things, this may include:

▪ Misstatements due to fraudulent financial reporting or revenue recognition

▪ Misstatements related to using assets for illegal, inappropriate or unintended purposes (such as wire fraud or fictitious vendors)

▪ Fraudulently obtained revenue and assets

▪ Attempts to avoid costs and expenses

63.    In the same section, under the subheading "Insider Trading," the Code of Conduct states the following, in relevant part:

While working on behalf of Micron, you may become aware of material, nonpublic information about our Company, our owners, our customers or other companies. Material, nonpublic information (also known as inside information) is information about a company that is not known to the general public and that could influence a typical investor's decision to buy, sell or hold that company's securities. Information is no longer nonpublic when it has been widely disseminated to the public and a reasonable waiting period has passed so that the information has been absorbed by the marketplace.

* * *

Trading on material, nonpublic information violates insider trading laws. Anyone involved in insider trading could be subject to disciplinary action, as well as potential civil or criminal penalties. It is also illegal to provide inside information to others (or tip them) to influence their investment decisions.

Insider trading is taken very seriously. You may face penalties for misusing inside information even if the amount of money involved was small — or even if you made no profit at all.

64.    In a section titled "Waivers," the Code of Conduct states the following:

Any waiver of the Code for a senior officer or above, or for directors, may be made only by the board of directors or a board committee and must be promptly disclosed as required by applicable laws.

COMPLAINT AND DEMAND FOR JURY TRIAL - 19

65.    In violation of the Code of Conduct, the Individual Defendants (as key officers and members of the Company's Board) conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public, and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, gross mismanagement, abuse of control, waste of corporate assets, unjust enrichment, and violations of the Exchange Act. Also, in violation of the Code of Conduct, the Individual Defendants failed to comply with laws and regulations, conduct business in an honest and ethical manner, and properly report violations of the Code of Conduct.

## AUDIT COMMITTEE CHARTER

66.    The Company also maintains an Audit Committee Charter. Under a section titled "Purpose," the Audit Committee Charter states the following:

> The purpose of the Audit Committee of the Board of Directors (the "Board") of Micron Technology, Inc. (the "Company") shall be to:
>
> **1.01. Oversight and Monitoring**. Assist the Board in overseeing and monitoring (a) the integrity of the Company's financial statements including the accounting and financial reporting processes and audits of the financial statements, (b) the Company's compliance with legal and regulatory requirements, (c) the independent auditor's qualifications and independence, and (d) the performance of the Company's internal audit function and of its independent auditors; and
>
> **1.02. Reporting**. Prepare the report required by the Securities and Exchange Commission (the "SEC") to be included in the Company's annual proxy statement.

67.    Under a section titled "Duties and Responsibilities," under the subheading "Financial Reporting – Discussions, Reviews and Approvals," the Audit Committee Charter states the responsibilities of the Audit Committee as follows:

> 4.04.01 The Audit Committee shall review and discuss with management and the independent auditors the annual audited financial statements and quarterly unaudited financial statements, including the Company's disclosures under "Management's Discussion and Analysis of Financial Condition and Results of

Operations," prior to filing with the SEC the Company's Annual Report on Form 10-K and Quarterly Reports on Form 10-Q, respectively, and recommend to the Board whether the audited financial statements should be included in the Form 10-K.

4.04.02 The Audit Committee shall discuss with management and the independent auditor significant financial reporting issues and judgments made in connection with the preparation of the Company's annual and quarterly financial statements, including any (a) significant changes in the Company's selection or application of accounting principles, (b) major issues as to the adequacy of the Company's internal controls, and (c) special steps adopted by the Company in light of identified material control deficiencies.

4.04.03 The Audit Committee shall discuss with management the Company's earnings press releases, including the use of "pro forma" or "adjusted" non-GAAP information, as well as financial information and earnings guidance. Such discussion may be done generally (consisting of discussing the types of information to be disclosed and the types of presentations to be made).

4.04.04 The Audit Committee shall review annually, prior to the completion of the independent auditor's annual audit of the Company's year-end financial statements (the "Annual Audit"), the independent auditor's report that describes (a) the critical accounting policies and practices to be used in the Annual Audit, (b) all alternative treatments of financial information within generally accepted accounting principles that have been discussed with management, ramifications of the use of such alternative disclosures and treatments on the Company's financial statements, and the treatment preferred by the independent auditor, (c) critical audit matters identified by the independent auditor, if any, and (d) other material written communications between the independent auditor and management. Review annually any reports on such topics or similar topics prepared by management.

4.04.05 The Audit Committee shall discuss with the independent auditor any material issues raised in the report referred to in Section 4.04.04.

4.04.06 The Audit Committee shall review any quarterly report addressed to management prepared by the independent auditor and any quarterly reports with an "ineffective" audit rating addressed to management prepared by the independent auditors or internal auditors and any responses thereto.

4.04.07 The Audit Committee shall review and discuss with management and the independent auditors the Company's Annual and Quarterly Reports on Form 10-K and Form 10-Q and shall approve such annual and quarterly reports prior to the filing of the report with the SEC.

68.    In the same section, under the subheading "Financial Reporting Process," the Audit

COMPLAINT AND DEMAND FOR JURY TRIAL - 21

Committee Charter states the responsibilities of the Audit Committee as follows:

4.06.01 Annually.

4.06.01.01 The Audit Committee shall at least annually, obtain and review the independent auditor's report describing: (a) the audit firm's internal quality-control procedures; (b) any material issues raised by the most recent internal quality-control review, or peer review, of the audit firm or by any inquiry or investigation by governmental or professional authorities, within the preceding five years, respecting one or more independent audits carried out by the firm, and any steps taken to deal with any such issues; and (c) all relationships between the independent auditor and the Company.

4.06.01.02 The Audit Committee shall at least annually, assess the qualifications, performance and independence of the independent auditor, including the lead partner, based on the report referred to immediately above and the opinions of management and of the internal auditors. The Audit Committee shall actively engage in a dialogue with the independent auditor with respect to any disclosed relationships or services that may impact the objectivity and independence of the auditor. The Audit Committee shall take appropriate action to satisfy itself of the independence of the auditor, including whether the provision of non-audit services by the independent auditor is compatible with the auditor's independence. The Audit Committee shall present its conclusion regarding the independence of the outside auditor to the Board at least annually.

4.06.01.03 The Audit Committee shall review with the independent auditors any audit problems or difficulties encountered in the course of the audit work, including any restrictions placed on the scope of the independent auditors' activities or on access to information or personnel, and the adequacy of management's response. This review shall also include a discussion of the Company's internal controls.

4.06.01.04 The Audit Committee shall discuss with the Company's independent auditors the matters required to be discussed by the applicable requirements of the Public Company Accounting Oversight Board and the SEC.

4.06.02 Quarterly.

4.06.02.01 The Audit Committee shall direct the Company's independent auditors to review, before being filed with the SEC, the Company's interim financial statements included in Quarterly Reports on Form 10-Q, using professional standards and procedures for conducting such reviews.

4.06.02.02 The Audit Committee shall review and discuss with management, the internal auditors, if applicable, and the independent auditor the adequacy and effectiveness of the Company's internal controls, including any changes, significant deficiencies or material weaknesses in those controls reported by the

independent auditor, the internal auditors, if applicable, or management and any special audit steps adopted or changes required in light of any material control deficiencies, the reports and certifications regarding internal control over financial reporting and any fraud, whether or not material, that involves management or other Company employees who have a significant role in the Company's internal controls.

4.06.02.03 The Audit Committee shall review at least quarterly the adequacy of the Company's system of internal control over financial reporting, including meeting periodically with the Company's management, internal auditors (or the personnel responsible for the internal audit function) and the independent auditors.

69.     In the same section, under the subheading "Compliance/General," the Audit

Committee Charter states the responsibilities of the Audit Committee as follows:

4.07.01 The Audit Committee shall review periodically, with the Company's Chief Compliance Officer or his or her designee, the Company's compliance with material legal and regulatory requirements. The Audit Committee may also discuss periodically with the Chief Compliance Officer or his or her designee legal matters that may have a significant impact on the Company's financial statements.

4.07.02 The Chief Compliance Officer and/or his or her designee shall, no less than annually, report to the Audit Committee on the implementation and effectiveness of the compliance and ethics program.

4.07.03 The Chief Compliance Officer and/or his or her designee shall have express authority to report personally to the Audit Committee on any matter involving criminal conduct or potential criminal conduct.

4.07.04 The Audit Committee shall meet separately, and periodically, with management and the independent auditor.

4.07.05 The Audit Committee shall review guidelines and policies with respect to risk assessment including enterprise risk management and the steps management has taken to identify, assess, prioritize, monitor and mitigate such risks. This review shall include a discussion of exposure to major financial risks (except for the use of hedges, derivative instruments and similar risk management techniques, which the Finance Committee has responsibility for reviewing) and major operational risks, other than enterprise cybersecurity, information technology and data protection risks associated with the Company's products, services, information technology infrastructure and related operations and any other risks specifically delegated for oversight by the Security Committee. Notwithstanding the foregoing, it is management's responsibility to assess and manage the Company's exposure to these risks, and it is the Audit Committee's responsibility is to discuss the guidelines and policies by which risk assessment and management is undertaken.

4.07.06 The Audit Committee shall review and discuss with management and the internal audit function the controls, procedures and processes that the Company has in place to ensure the accuracy of its material disclosures and reporting relating to environmental, social and governance matters, including any assurance provided by the independent auditor or other third party.

4.07.07 The Audit Committee shall set clear hiring policies with respect to employees or former employees of the independent auditors.

4.07.08 The Audit Committee shall establish procedures for: (a) the receipt, retention, and treatment of complaints received by the Company regarding accounting, internal accounting controls or auditing matters; and (b) the confidential, anonymous submission by employees of the Company of concerns regarding questionable accounting or auditing matters.

4.07.09 The Audit Committee shall oversee compliance with the SEC requirements for disclosure of auditor's services, fees, Audit Committee member qualifications and activities.

4.07.10 The Audit Committee shall review the Company's tax positions and strategies.

4.07.11 The Audit Committee shall (i) review and oversee all transactions between the Company and a related person (as defined in Item 404 of Regulation S-K) for which review or oversight is required by applicable law or that are required to be disclosed in the Company's financial statements or SEC filings and (ii) develop and maintain policies and procedures for the Audit Committee's review, approval and/or ratification of such transactions.

4.07.12 The Audit Committee shall submit for approval recommendations to the Board with respect to any activities within the scope of the Audit Committee's duties set forth in this Charter that require approval of the Board.

4.07.13 The Audit Committee shall carry out such other activities within the scope of the Audit Committee's purpose or as the Board may from time to time delegate to it.

70.    In the same section, under the subheading "Internal Audit," the Audit Committee

Charter states the responsibilities of the Audit Committee as follows:

4.08.01 The Audit Committee shall review the responsibilities, budget and staffing of the Company's Internal Audit Department.

4.08.02 The Audit Committee shall oversee the selection, appointment,

compensation and retention of the leader of the Company's Internal Audit Department.

4.08.03 The Audit Committee shall meet separately, and periodically, with the leader of the Company's Internal Audit Department to review the results of the internal audit program, including significant issues in internal audit reports and responses by management.

71.      In the same section, under the subheading "Reports," the Audit Committee Charter states the responsibilities of the Audit Committee as follows:

4.10.01 The Audit Committee shall report regularly to the Board regarding the Audit Committee's activities, examinations and recommendations, as may be appropriate and as are consistent with this Charter.

4.10.02 The Audit Committee shall report at least annually to the Board the Audit Committee's conclusions as to the independent auditors.

4.10.03 The Audit Committee shall be responsible for preparing the report required by the rules and regulations of the SEC to be included in the proxy statement for the annual meeting of stockholders.

72.      In violation of the Audit Committee Charter, the Individual Defendants conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, gross mismanagement, abuse of control, waste of corporate assets, and violations of Sections 14(a), 10(b), and 20(a) of the Exchange Act. Moreover, in violation of the Audit Committee Charter, the Individual Defendants failed to maintain the accuracy of the Company's records and reports, comply with laws and regulations, act in good faith and diligence without misstating, misrepresenting, or omitting material facts, and properly report violations of the Audit Committee Charter.

## THE INDIVIDUAL DEFENDANTS' MISCONDUCT

### Relevant Background

73.    Micron is a technology company that designs, develops, produces, and distributes computer memory and storage products. Among these products are DRAM, NAND, NOR, and HBM semiconductor devices.

74.    DRAM products are semiconductor devices with low latency that are capable of providing high-speed data retrieval with a variety of performance characteristics. DRAM products are considered "volatile," meaning they lose content when powered off, and as such are mainly utilized in data center, client PC, graphics, industrial, and automotive markets.

75.    HBM products are a type of DRAM product that have the ability to reach higher bandwidths while consuming less power. Supposedly, this makes HBM devices ideal for applications which otherwise require high data throughput and energy efficiency, such as AI applications and high-performance computing.

76.    NAND products are non-volatile, re-writeable semiconductor storage devices. NAND products are capable of providing high-capacity, low-cost storage with varying performance characteristics. NAND is mainly used in SSDs for the data center, client PC, consumer, automotive, and removable storage markets.

77.    NOR products are non-volatile, re-writable semiconductor memory devices that are capable of posting fast read speeds. NOR devices are typically used for reliable coding storage and frequently changing small data storage.

78.    The Company reports its sales across multiple business units. Among these business units are the Compute and Networking Business Unit ("CNBU"), Mobile Business Unit ("MBU"), Embedded Business Unit ("EBU"), and Storage Business Unit ("SBU"). Among the products developed and marketed to consumers are NAND flash memory devices, such as SSD cards and flash drives.

COMPLAINT AND DEMAND FOR JURY TRIAL - 26

79.     Within the consumer market, these sales include various products by different business units. One example is that the Company's CNBU products are commonly incorporated into gaming consoles and PC graphics cards. Separately, the MBU products are incorporated into smartphones and other mobile devices. The Company's EBU products are designed for use in digital home assistants, video cameras, and home networking devices. Lastly, the SBU products are designed for use in PCs.

80.     Prior to the start of the Relevant Period, the Company noted in its regulatory filings that "[t]he memory and storage industry environment deteriorated sharply in the fourth quarter of 2022 and throughout 2023 due to weak demand in many end markets combined with global and macroeconomic challenges and lower demand resulting from customer actions to reduce inventory levels[,]" which "led to significant reductions in average selling prices for both DRAM and NAND and bit shipments for DRAM, resulting in declines in revenue across all [of Micron's] business segments and nearly all [of its] end markets."

## FALSE AND MISLEADING STATEMENTS

### September 28, 2023 Press Release

81.     The Relevant Period began on September 28, 2023 when the Company issued the FY 2023 Earnings Release. The FY 2023 Earnings Release quoted Defendant Mehrotra, who highlighted the Company's position for recovery at the end of the 2023 Fiscal Year leading into the 2024 Fiscal Year, stating:

> During fiscal 2023, amid a challenging environment for the memory and storage industry, Micron sustained technology leadership, launched a significant number of leading-edge products, and took decisive actions on supply and cost Our 2023 performance positions us well as a market recovery takes shape in 2024, driven by increasing demand and disciplined supply. We look forward to record industry TAM [total addressable market] revenue in 2025 as AI proliferates from the data center to the edge.

*October 6, 2023 Form 10-K*

82.     October 6, 2023, the Company filed its annual report for the 2023 Fiscal Year on Form 10-K with the SEC (the "2023 10-K"). The 2023 10-K was signed by Defendants Mehrotra, Murphy, Beyer, Dugle, Gomo, Haynesworth, McCarthy, Switz, and Wright and attached certifications pursuant to Rules 13a-14(a) and 15(d)-14(a) under the Exchange Act and the Sarbanes-Oxley Act of 2002 ("SOX") signed by Defendants Mehrotra and Murphy attesting to the accuracy of the 2023 10-K and that "this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report."

83.     In discussing overall demand recover for the Company's products, the 2023 10-K revealed that:

> Ongoing demand growth, customer inventory normalization, and industry-wide supply discipline have set the stage for increased revenue, and improved pricing and profitability throughout fiscal 2024. As a result, pricing trends have started to improve and there were no write downs of inventories to net realizable value in the fourth quarter of 2023.

84.     In addition, the 2023 10-K also revealed that the demand recovery for the Company's DRAM and NAND products specifically "is improving as customer inventory levels continue to normalize and secular growth drivers remain intact[.]"

*2023 Proxy Statement*

85.     On November 29, 2023, the Company filed its Schedule 14A with the SEC (the "2023 Proxy Statement"). Defendants Mehrotra, Beyer, Dugle, Gomo, Haynesworth, McCarthy, Switz, and Wright solicited the 2023 Proxy Statement, which was filed pursuant to Section 14(a) of the Exchange Act and contained material misstatements and omissions.

86.     The 2023 Proxy Statement called for Company shareholders to vote to, *inter alia*:

(1) reelect Defendants Mehrotra, Beyer, Dugle, Gomo, Haynesworth, McCarthy, Switz, and

Wright to the Board; (2) approve, on an advisory basis, executive compensation; (3) approve, on

an advisory basis, the frequency of future votes on executive compensation; and (4) ratify the

appointment of PricewaterhouseCoopers LLP as the Company's independent registered public

accounting firm for the 2024 Fiscal Year.

87.     With respect to the Company's Code of Conduct, the 2023 Proxy Statement stated

the following:

> Acting ethically is a critical part of our culture and our vision to transform how the
> world uses information to enrich life for all. The Board has adopted a Code of
> Business Conduct and Ethics that is applicable to all our directors, officers, and
> team members. The Code of Business Conduct and Ethics sets out our expectations
> regarding the treatment of our team members, customers, and the communities in
> which we operate, as well as our commitment to high product quality, ethical and
> legal sourcing of our materials, and acting with integrity for our investors. A copy
> of our Code of Business Conduct and Ethics is available at *www.micron.com* and
> is also available in print without charge upon request. Any amendments or waivers
> of the Code of Business Conduct and Ethics will also be posted on our website
> within four business days of the amendment or waiver as required by applicable
> rules and regulations of the SEC and the Listing Rules of Nasdaq.

88.     Regarding "Risk Assessment and Mitigation," the 2023 Proxy Statement stated the

following:

> We operate in a dynamic economic, social, and political landscape, making
> structured and conscientious risk management more important than ever. Our
> Board reviews and oversees our enterprise risk management program, which is a
> unified approach to risk management that helps us achieve a shared understanding
> of risks and make informed business decisions. This approach enhances our
> capability to address future events that create uncertainty and respond in an efficient
> and effective manner. It also facilitates prompt action to mitigate identified risks
> and embeds risk management into our culture.
>
> The Board has delegated primary oversight of our enterprise risk management
> process to the Audit Committee, which conducts reviews of our risk assessment
> and enterprise risk management policies as described below, including overseeing
> the management of risks related to financial reporting and compliance. Other Board

committees provide additional insights into our enterprise risk management program in the areas of their core competencies, and report to the Board regularly on matters relating to the following specific areas of risk the committees oversee:

- The Compensation Committee oversees management of risks relating to our compensation plans and programs.

- The Finance Committee oversees the Company's strategies for management of significant financial risks.

- The Governance and Sustainability Committee oversees risks associated with the Board's governance, director independence, the Company's human capital programs and sustainability initiatives, and public policy and government affairs activities.

- The Security Committee oversees risks associated with physical security and cybersecurity.

In performing their oversight responsibilities, the Board and each committee has full access to management, as well as the ability to engage independent advisors. In addition, the Chairman of the Board leads regular executive sessions of the independent directors, facilitates cross-committee feedback, and fosters open dialogue and constructive feedback among the independent directors, which further supports the Board's ability to fulfill its risk oversight duties.

89. Defendants Mehrotra, Beyer, Dugle, Gomo, Haynesworth, McCarthy, Switz, and Wright caused the 2023 Proxy Statement to be false and misleading by failing to disclose, *inter alia*, that: (1) the demand for the Company's products in consumer markets, specifically the demand for the Company's NAND products, had significantly declined; (2) as a result, the amount Company's demand had recovered as was reported to investors was overstated, specifically the demand in consumer markets and for NAND products; (3) the sustainability of demand for these products, as well as the normalization of inventory for these products, was also overstated to investors; and (4) the Company failed to maintain internal controls. As a result of the foregoing, the Individual Defendants' statements about the Company's business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

90. The 2023 Proxy Statement was false and misleading because, despite assertions to

the contrary, the Company's Code of Conduct and the Audit Committee Charter were not followed, as evidenced by the Individual Defendants: (1) making and/or causing the Company to make the numerous false and misleading statements and omissions alleged herein; and (2) failing to report violations of the Code of Conduct. Further, the 2023 Proxy Statement was materially false and misleading because, despite assertions to the contrary, the Board was not adequately performing its risk oversight functions.

91.     As a result of Defendants Mehrotra, Beyer, Dugle, Gomo, Haynesworth, McCarthy, Switz, and Wright causing the 2023 Proxy Statement to be false and misleading, Company shareholders voted, *inter alia*, to: (1) reelect Defendants Mehrotra, Beyer, Dugle, Gomo, Haynesworth, McCarthy, Switz, and Wright to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company; (2) approve executive compensation; (3) approve the frequency of future votes on executive compensation; and (4) ratify the appointment of PricewaterhouseCoopers LLP as the Company's independent registered public accounting firm for the 2024 Fiscal Year.

### *December 21, 2023 Form 10-Q*

92.     On December 21, 2023, the Company filed its quarterly report for the first quarter of the 2024 Fiscal Year on Form 10-Q with the SEC (the "Q1 2024 10-Q"). The Q1 2024 10-Q was signed by Defendant Murphy and attached SOX certifications signed by Defendants Mehrotra and Murphy attesting to the accuracy of the Q1 2024 10-Q and that "this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report."

93.     The Q1 2024 10-Q discussed the Company's supposed continued recovery of its

demand for the Company's products, stating, *inter alia*:

> For the first quarter of 2024, improving demand growth driven in part by deployment of [AI], customer inventory normalization, and industry-wide supply discipline, resulted in an improved industry supply and demand balance. As a result, we have experienced improvements in pricing and margins.

94.    The Q1 2024 10-Q also discussed an increase in its MBU revenue, stating that "for the first quarter of 2024 as compared to the fourth quarter of 2023 . . . MBU revenue increased 7% primarily due to increases in average selling prices and NAND bit shipments, driven by improved end market demand."

### *March 21, 2024 Form 10-Q*

95.    On March 21, 2024, the Company filed its quarterly report for the second quarter of the 2024 Fiscal Year on Form 10-Q with the SEC (the "Q2 2024 10-Q"). The Q2 2024 10-Q was signed by Defendant Murphy and attached SOX certifications signed by Defendants Mehrotra and Murphy attesting to the accuracy of the Q2 2024 10-Q and that "this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report."

96.    In providing an update on the Company's demand recovery with respect to its products, the Q2 2024 10-Q stated:

> For the first six months of 2024, increasing demand growth, driven in part by deployment of [AI] and mostly normal customer inventories, combined with industry-wide supply discipline, resulted in an improved industry supply and demand balance. As a result, we have experienced improvements in pricing and margins in 2024.

97.    Additionally, the Q2 2024 10-Q revealed an increase in the Company's SBU revenue, stating that "for the second quarter of 2024 as compared to the first quarter of 2024 . . . SBU revenue increased 39% primarily due to increases in NAND average selling prices and bit

shipments driven by strong demand across markets" and that "CNBU, MBU, and SBU operating income (loss) improved primarily due to increases in average selling prices as a result of improving conditions across most markets."

### June 26, 2024 Press Release

98.    On June 26, 2024, the Company issued a press release announcing its financial and operational results for the third quarter of the 2024 Fiscal Year (the "Q3 2024 Earnings Release"). The Q3 2024 Earnings Release quoted Defendant Mehrotra in discussing the recovery guidance for the pending 2025 Fiscal Year, stating that the Company is "well positioned to deliver a substantial revenue record in fiscal 2025."

### June 27, 2024 Form 10-Q

99.    The following day, on June 27, 2024, the Company filed its quarterly report for the third quarter of the 2024 Fiscal Year on Form 10-Q with the SEC (the "Q3 2024 10-Q"). The Q3 2024 10-Q was signed by Defendant Murphy and attached SOX certifications signed by Defendants Mehrotra and Murphy attesting to the accuracy of the Q3 2024 10-Q and that "this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report."

100.    The Q3 2024 10-Q discusses the supposed demand recovery of the Company's products, stating:

> For the first nine months of 2024, increasing demand growth, driven in part by deployment of [AI] and mostly normal customer inventories, combined with industry-wide supply discipline, resulted in an improved industry supply and demand balance. As a result, we have experienced improvements in pricing and margins in 2024.

101.    The Q3 2024 10-Q also discusses the Company's operating income, explaining that

"[f]or the third quarter of 2024 as compared to the third quarter of 2023, CNBU, MBU, and SBU operating income (loss) improved primarily due to increases in average selling prices . . . and increases in bit sales as a result of improving conditions across most markets in 2024"; and that "[f]or the first nine months of 2024 as compared to the first nine months of 2023, operating income (loss) improved for CNBU, MBU, and SBU primarily due to . . . increases in bit sales, and increases in MBU and SBU average selling prices as a result of improving conditions across most markets in 2024."

### *September 25, 2024 Press Release*

102.    On September 25, 2024, the Company issued a press release announcing its financial and operational results for the fourth quarter and full year of the 2024 Fiscal Year (the "FY 2024 Earnings Release"). The FY 2024 Earnings Release included a quote from Defendant Mehrotra, who stated on the Company's projections:

> We are entering fiscal 2025 with the best competitive positioning in Micron's history. We forecast record revenue in fiscal Q1 and a substantial revenue record with significantly improved profitability in fiscal 2025.

### *October 4, 2024 Form 10-K*

103.    On October 4, 2024, the Company filed its annual report for the 2024 Fiscal Year on Form 10-K with the SEC (the "2024 10-K"). The 2024 10-K was signed by Defendants Mehrotra, Murphy, Beyer, Dugle, Gomo, Haynesworth, McCarthy, Swan, Switz, and Wright and attached SOX certifications signed by Defendants Mehrotra and Murphy attesting to the accuracy of the 2024 10-K and that "this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report."

104.    In discussing the supposed recovery in the demand for the Company's products, the 2024 10-K stated that:

> Throughout 2024, we experienced substantial improvements in pricing and margins. Increasing demand growth, driven in part by deployment of AI and mostly normal customer inventories, combined with industry-wide supply discipline, resulted in an industry supply and demand balance that substantially improved from 2023 conditions. We executed well on pricing and improved our financial performance significantly from the start of the year. We are exiting the year with excellent momentum and an industry-leading product portfolio.

105.    Further, in regards to the supposed recovery in demand for the Company' MBU products specifically, the 2024 10-K stated:

> The proliferation of smartphones, tablets, and other mobile devices continues to increase the demand for memory chips. These devices require high-performance memory to support various applications, from gaming to productivity. Smartphones offer tremendous potential for personalized AI capabilities that offer greater security and responsiveness when executed on the device. Enabling these on-device AI capabilities is driving increased memory and storage capacity needs and increasing demand for new value-add solutions.

106.    The statements in ¶¶81-84 and 92-105 above were materially false and misleading and failed to disclose, *inter alia*, that: (1) the demand for the Company's products in consumer markets, specifically the demand for the Company's NAND products, had significantly declined; (2) as a result, the amount Company's demand had recovered as was reported to investors was overstated, specifically the demand in consumer markets and for NAND products; (3) the sustainability of demand for these products, as well as the normalization of inventory for these products, was also overstated to investors; and (4) the Company failed to maintain internal controls. As a result of the foregoing, the Individual Defendants' statements about the Company's business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

***2024 Proxy Statement***

COMPLAINT AND DEMAND FOR JURY TRIAL - 35

107.    On November 26, 2024, the Company filed the 2024 Proxy Statement with the SEC. Defendants Mehrotra, Beyer, Dugle, Gomo, Haynesworth, McCarthy, Swan, Switz, and Wright solicited the 2024 Proxy Statement, which was filed pursuant to Section 14(a) of the Exchange Act and contained material misstatements and omissions.

108.    The 2024 Proxy Statement called for Company shareholders to vote to, *inter alia*: (1) reelect Defendants Mehrotra, Beyer, Dugle, Gomo, Haynesworth, McCarthy, Swan, and Wright to the Board; (2) approve, on an advisory basis, executive compensation; (3) approve the 2025 Equity Incentive Plan; and (4) ratify the appointment of PricewaterhouseCoopers LLP as the Company's independent registered public accounting firm for the 2025 Fiscal Year.

109.    In discussing the 2025 Equity Incentive Plan, the 2024 Proxy Statement discloses that the 2025 Equity Incentive Plan would replace the pre-existing 2007 plan and Nonstatutory Stock Option Plan ("NSOP"). In addition, the 2025 Equity Incentive Plan would make 49,000,000 shares available for issuance. As there were only 35,853,755 shares remaining under the 2007 plan as well as an additional 3,253,144 shares available under the NSOP, the 2025 Equity Incentive Plan would add an additional 9,893,101 shares. The 2024 Proxy Statement estimated that this amount of shares would meet the Company's needs through 2028.

110.    The 2024 Proxy Statement also identified that, should shareholders not approve the 2025 Equity Incentive Plan, the 2007 plan and NSOP would remain in effect, however they "may not be sufficient for [the Company] to be able to achieve [the Company's] goals[.]" Additionally, directors would be entitled to receive awards under the 2025 Equity Incentive Plan.

111.    With respect to the Company's Code of Conduct, the 2024 Proxy Statement stated the following:

> Acting ethically is a critical part of our culture and our vision to transform how the world uses information to enrich life for all. The Board has adopted a Code of

Business Conduct and Ethics that is applicable to all our directors, officers, and team members. The Code of Business Conduct and Ethics sets out our expectations regarding the treatment of our team members, customers, and the communities in which we operate, as well as our commitment to high product quality, ethical and legal sourcing of our materials, and acting with integrity for our investors. A copy of our Code of Business Conduct and Ethics is available at www.micron.com and is also available in print without charge upon request to corporatesecretary@micron.com. Any amendments or waivers of the Code of Business Conduct and Ethics will also be posted on our website as required by applicable rules and regulations of the SEC and the Listing Rules of Nasdaq.

112.   Regarding "Risk Oversight, Assessment and Mitigation," the 2024 Proxy

Statement stated the following:

We operate in a dynamic economic, social, and political landscape, making structured and conscientious risk management more important than ever. Our Board reviews and oversees our enterprise risk management program, which is a unified approach to risk management that helps us achieve a shared understanding of risks and make informed business decisions. This approach enhances our capability to address future events that create uncertainty and respond in an efficient and effective manner. It also facilitates prompt action to mitigate identified risks and embeds risk management into our culture.

The Board has delegated primary oversight of our enterprise risk management process to the Audit Committee, which conducts reviews of our risk assessment and enterprise risk management policies as described below, including overseeing the management of risks related to financial reporting and compliance. Other Board committees provide additional insights into our enterprise risk management program in the areas of their core competencies, and report to the Board regularly on matters relating to the following specific areas of risk the committees oversee:

- The Compensation Committee oversees management of risks relating to our compensation plans and programs.

- The Finance Committee oversees the Company's strategies for management of significant financial risks.

- The Governance and Sustainability Committee oversees risks associated with the Board's governance, director independence, the Company's human capital programs and sustainability initiatives, and public policy and government affairs activities.

- The Security Committee oversees risks associated with physical security and cybersecurity.

COMPLAINT AND DEMAND FOR JURY TRIAL - 37

In performing their oversight responsibilities, the Board and each committee has full access to management, as well as the ability to engage independent advisors. In addition, the Chair of the Board leads regular executive sessions of the independent directors, facilitates cross-committee feedback, and fosters open dialogue and constructive feedback among the independent directors, which further supports the Board's ability to fulfill its risk oversight duties. Following the conclusion of our Annual Meeting, our Lead Independent Director will fulfill these duties. See "Proposal 1 - Election of Directors—Board's Roles and Responsibilities—Board Leadership Structure."

113.    Defendants Mehrotra, Beyer, Dugle, Gomo, Haynesworth, McCarthy, Swan, Switz, and Wright caused the 2024 Proxy Statement to be false and misleading by failing to disclose, *inter alia*, that: (1) the demand for the Company's products in consumer markets, specifically the demand for the Company's NAND products, had significantly declined; (2) as a result, the amount Company's demand had recovered as was reported to investors was overstated, specifically the demand in consumer markets and for NAND products; (3) the sustainability of demand for these products, as well as the normalization of inventory for these products, was also overstated to investors; (4) the Company failed to maintain internal controls; and (5) the Individual Defendants were improperly interested in increasing their future compensation by seeking shareholder approval of the 2025 Equity Incentive Plan. As a result of the foregoing, the Individual Defendants' statements about the Company's business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

114.    The 2024 Proxy Statement was false and misleading because, despite assertions to the contrary, the Company's Code of Conduct and the Audit Committee Charter were not followed, as evidenced by the Individual Defendants: (1) making and/or causing the Company to make the numerous false and misleading statements and omissions alleged herein; and (2) failing to report violations of the Code of Conduct. Further, the 2024 Proxy Statement was materially false and misleading because, despite assertions to the contrary, the Board was not adequately

performing its risk oversight functions.

115.    As a result of Defendants Mehrotra, Beyer, Dugle, Gomo, Haynesworth, McCarthy, Swan, Switz, and Wright causing the 2024 Proxy Statement to be false and misleading, Company shareholders voted, *inter alia*, to: (1) reelect Defendants Mehrotra, Beyer, Dugle, Gomo, Haynesworth, McCarthy, Swan, and Wright to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company; (2) approve executive compensation; (3) approve the 2025 Equity Incentive Plan; and (4) ratify the appointment of PricewaterhouseCoopers LLP as the Company's independent registered public accounting firm for the 2025 Fiscal Year.

## THE TRUTH EMERGES

116.    The truth emerged on December 18, 2024, after the market closed, when the Company published the Q1 2025 Earnings Release. The Q1 2025 Earnings Release revealed, *inter alia*, that the Company was expecting a greater-than-expected revenue decline in its NAND flash memory for the first quarter. Additionally, the Q1 2025 Earnings Release revealed that the Company's guidance was receiving a negative update. Among this negative guidance was a decrease in the adjusted earnings guidance to between $1.33 and $1.53 per share, far below the $1.92 per share original estimate. Sales guidance was decreased to between $7.7 billion and $8.1 billion, housing a midpoint far below the original $8.99 billion estimate. Lastly, adjusted gross margin guidance was decreased to between 37.5% and 39.5%, far below the 41.3% original estimate. In explaining the disappointing results, the Q1 2025 Earnings Release quoted Defendant Mehrotra in stating that "consumer-oriented markets are weaker in the near term[.]"

117.    Analysts reacted to this news negatively, with many adjusting their own guidance and projections on the Company as a result. For example, UBS decreased its price target on the Company from $135 to $125, writing that the Company's second quarter guidance "was below

even the most bearish bogeys . . . with the company citing ongoing malaise in consumer markets - especially PC - which is hurting the NAND business in particular." Similarly, Bank of America reduced its price target on the Company from $125 to $110, and downgraded its rating on the Company's stock from "Buy" to "Neutral," stating that "weakness in PC and phone markets are putting downward pressure on memory pricing, especially in NAND." Morgan Stanley reduced its price target on the Company from $114 down to $98, stating that "NAND weakness [had] take[n] its toll[,]" noting that "Micron guided revenue below expectations driven mostly by revenue decline in NAND[,]" that "NAND will drive most of the revenue decline in February, which implies a sequential decline of about 20% in revenue[,]" and that "Micron has very clearly decided that NAND is oversupplied, cutting capex, cutting back on wafer starts by about 15%, and preparing for a sustained period of weak demand."

118.    On this news, the price per share of the Company's stock fell from a closing price of $10.21 per share on November 26, 2024 to close at $8.57 per share on November 27, 2024. It continued to dramatically fall, closing at $2.03 per share on November 29, 2024 and then $1.75 per share on December 2, 2024, representing a total decline of more than 80%. In addition, analysts responded negatively to these disclosures, with Leerink Partners reporting that the CRL "comes as a major surprise, given the progress the company appeared to be making with the FDA" and "[w]e thought the FDA review had been progressing favorably based on the information available to us."

119.    On this news, the price per share of the Company's stock fell $16.81, or approximately 16.2%, from a closing price of $103.90 per share on December 18, 2024 to close at $87.09 per share on December 19, 2024.

## REPURCHASES DURING THE RELEVANT PERIOD

120.    During the Relevant Period, the Individual Defendants caused the Company to

initiate repurchases of its common stock that substantially damaged the Company. In total, the Company spent an aggregate amount of approximately $303.5 million to repurchase approximately 3,249,449 shares of its own common stock at artificially inflated prices between June 28, 2024 and August 29, 2024.

121.    According to the 2024 10-K, between June 28, 2024 and July 25, 2024, the Company repurchased 25,931 shares of its own common stock at an average price per share of approximately $133.55, for a total cost to the Company of approximately $3,463,085.

122.    As the Company's stock was actually worth only $87.09 per share, the price at closing on December 19, 2024, the Company overpaid by approximately $1,204,754 for repurchases of its own stock between June 28, 2024 and July 25, 2024.

123.    According to the 2024 10-K, between July 26, 2024 and August 29, 2024, the Company repurchased 3,223,518 shares of its own common stock at an average price per share of approximately $93.07, for a total cost to the Company of approximately $300,012,820.

124.    As the Company's stock was actually worth only $87.09 per share, the price at closing on December 19, 2024, the Company overpaid by approximately $19,276,637 for repurchases of its own stock between July 26, 2024 and August 29, 2024.

125.    Thus, in total, during the Relevant Period, the Company overpaid for repurchases of its own stock by approximately $20,481,391.

## DAMAGES TO MICRON

126.    As a direct and proximate result of the Individual Defendants' conduct, Micron will lose and expend many millions of dollars.

127.    Such expenditures include, but are not limited to, legal fees, costs, and any payments for resolution of or to satisfy any judgments associated with the Securities Class Action,

and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

128.    Such expenditures also include, but are not limited to, fees, costs, and any payments for resolution of or to satisfy judgments associated with any other lawsuits filed against the Company or the Individual Defendants based on any misconduct alleged herein and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

129.    Such expenditures will also include costs incurred in any internal investigations pertaining to violations of law, costs incurred in defending any investigations or legal actions taken against the Company due to its violations of law, and payments of any fines or settlement amounts associated with the Company's violations.

130.    Such expenditures include the $20,481,391 that the Individual Defendants caused the Company to overpay for repurchases of its own stock while the stock price was artificially inflated as a result of the false and misleading statements alleged herein

131.    Additionally, these expenditures include, but are not limited to, unjust compensation, benefits, and other payments provided to the Individual Defendants who breached their fiduciary duties to the Company.

132.    As a direct and proximate result of the Individual Defendants' conduct, Micron has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's and their misrepresentations.

## DERIVATIVE ALLEGATIONS

133.    Plaintiff brings this action derivatively and for the benefit of Micron to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their fiduciary duties as directors and/or officers of Micron, gross mismanagement, abuse of control,

waste of corporate assets, unjust enrichment, and violations of the Exchange Act.

134.    Micron is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

135.    Plaintiff is, and has been at all relevant times, a shareholder of Micron. Plaintiff will adequately and fairly represent the interests of Micron in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

## DEMAND FUTILITY ALLEGATIONS

136.    Plaintiff incorporates by reference and re-alleges each and every allegation stated above as if fully set forth herein.

137.    A pre-suit demand on the Board of Micron is futile and, therefore, excused.  At the time of filing of this complaint, the Board consists of the following eight individuals: Defendants Mehrotra, Beyer, Dugle, Gomo, Haynesworth, McCarthy, Swan, and Wright (the "Director-Defendants"). Plaintiff needs only to allege demand futility as to four of the eight Directors that were on the Board at the time of the filing of this complaint.

138.    Demand is excused as to all of the Director-Defendants because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of the scheme they engaged in knowingly or recklessly to make and/or cause the Company to make false and misleading statements and omissions of material fact, all of which renders the Director-Defendants unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the scheme.

139.    In addition, the Director-Defendants caused the 2024 Proxy Statement to call for a shareholder vote to approve the 2025 Equity Incentive Plan, which caused for there to be

49,000,000 shares available. The misrepresentations and omissions set forth herein were material to shareholders in voting to approve the 2025 Equity Incentive Plan who would not have approved the 2025 Equity Incentive Plan had they been informed about the Individual Defendants' misconduct. Before the shareholders approved the 2025 Equity Incentive Plan at the annual meeting of stockholders of Micron on January 16, 2025, there were 35,853,755 shares remaining under the 2007 plan as well as an additional 3,253,144 shares available under the NSOP. After the shareholders approved the 2025 Equity Incentive Plan, there were a total of 49,000,000 shares available for issuance. For this reason, the Individual Defendants, including the Director-Defendants, received material personal benefits that they otherwise would not receive but for from the issuance of the false and misleading 2024 Proxy Statement and the shareholders approving the 2025 Equity Incentive Plan that made the shares available. As such, the Director-Defendants face a substantial likelihood of liability and demand is futile as to them.

140.    In complete abdication of their fiduciary duties, the Director-Defendants either knowingly or recklessly caused or permitted the Company to issue the materially false and misleading statements alleged herein and as a result of their intentional or reckless approval of the unnecessary and harmful repurchases that caused the Company to overpay by approximately $20.5 million for its own common stock during the Relevant Period. The Director-Defendants, as alleged herein, were aware or should have been aware of the misinformation being spread by the Company and yet approved the repurchases. This renders the Director-Defendants unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the scheme. Thus, the Director-Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

141.    Additional reasons that demand on Defendant Mehrotra is futile to follow. Defendant Mehrotra has served as the Company's President and CEO and as a director since May 2017. He has served as the Chairman of the Company's Board since January 2025. Defendant Mehrotra is also a member of the Finance Committee. The Company provides Defendant Mehrotra with his principal occupation for which he receives handsome compensation. As such, as the Company admits, he is not an independent director. Furthermore, he solicited the 2023 Proxy Statement, which contained false and misleading statements and led to the re-election of Defendants Beyer, Dugle, Gomo, Haynesworth, McCarthy, Switz, Wright, and himself to the Board, which allowed them to continue to breach their fiduciary duties to the Company. Defendant Mehrotra also solicited the 2024 Proxy Statement, which contained false and misleading statements and contributed to the re-election of Defendants Beyer, Dugle, Gomo, Haynesworth, McCarthy, Swan, Wright, and himself to the Board, which allowed them to continue to breach their fiduciary duties to the Company, and the approval of the 2025 Equity Incentive Plan. As the trusted CEO, Defendant Mehrotra conducted little, if any, oversight of the schemes to cause the Company to engage in the making the false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the schemes, and consciously disregarded his duties to protect corporate assets. In addition, during the Relevant Period, he failed to correct the false and misleading statements alleged herein and personally made or signed many of the false and misleading statements alleged herein. He is is also a defendant in the Securities Class Action. Moreover, under the 2025 Equity Incentive Plan, Defendant Mehrotra is eligible to receive stock awards under the 2025 Equity Incentive Plan, thereby materially benefitting from the adoption of the 2025 Equity Incentive Plan. Further, Defendant Mehrotra's insider sales made while the Company's stock price was artificially inflated as a result of the false

and misleading statements alleged herein further demonstrate his motive to participate in the schemes. For these reasons, too, Defendant Mehrotra breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

142.    Additional reasons that demand on Defendant Beyer is futile follow. Defendant Beyer has served as a Company director since 2013. He also serves as the Chair of the Compensation Committee and as a member of the Governance and Sustainability Committee and the Security Committee. Defendant Beyer has received and continues to receive handsome compensation for his role as a director. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duty to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duty to protect corporate assets. Furthermore, he solicited the 2023 Proxy Statement, which contained false and misleading statements and led to the re-election of Defendants Mehrotra, Dugle, Gomo, Haynesworth, McCarthy, Switz, Wright, and himself to the Board, which allowed them to continue to breach their fiduciary duties to the Company. Defendant Beyer also solicited the 2024 Proxy Statement, which contained false and misleading statements and contributed to the re-election of Defendants Mehrotra, Dugle, Gomo, Haynesworth, McCarthy, Swan, Wright, and himself to the Board, which allowed them to continue to breach their fiduciary duties to the Company, and the approval of the 2025 Equity Incentive Plan. In addition, as a Company director, Defendant Beyer signed the false and misleading 2023 and 2024 10-Ks. Moreover, under the 2025 Equity Incentive Plan, Defendant Beyer is eligible to receive stock awards under the 2025 Equity Incentive Plan, thereby materially benefitting from the adoption of the 2025 Equity Incentive Plan. For these reasons, Defendant Beyer breached his

fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

143.    Additional reasons that demand on Defendant Dugle is futile follow. Defendant Dugle has served as a Company director since 2020, and as the Lead Independent Director since January 2025. She also serves as a member of the Governance and Sustainability Committee and the Security Committee. Defendant Dugle has received and continues to receive handsome compensation for her role as a director. As a trusted Company director, she conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded her duty to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duty to protect corporate assets. Furthermore, she solicited the 2023 Proxy Statement, which contained false and misleading statements and led to the re-election of Defendants Mehrotra, Beyer, Gomo, Haynesworth, McCarthy, Switz, Wright, and herself to the Board, which allowed them to continue to breach their fiduciary duties to the Company. Defendant Dugle also solicited the 2024 Proxy Statement, which contained false and misleading statements and contributed to the re-election of Defendants Mehrotra, Beyer, Gomo, Haynesworth, McCarthy, Swan, Wright, and herself to the Board, which allowed them to continue to breach their fiduciary duties to the Company, and the approval of the 2025 Equity Incentive Plan. In addition, as a Company director, Defendant Dugle signed the false and misleading 2023 and 2024 10-Ks. Moreover, under the 2025 Equity Incentive Plan, Defendant Dugle is eligible to receive stock awards under the 2025 Equity Incentive Plan, thereby materially benefitting from the adoption of the 2025 Equity Incentive Plan. For these reasons, Defendant Dugle breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

COMPLAINT AND DEMAND FOR JURY TRIAL - 47

144.    Additional reasons that demand on Defendant Gomo is futile follow. Defendant Gomo has served as a Company director since 2018. He also serves as the Chair of the Finance Committee and as a member of the Audit Committee. Defendant Gomo has received and continues to receive handsome compensation for his role as a director. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duty to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duty to protect corporate assets. Furthermore, he solicited the 2023 Proxy Statement, which contained false and misleading statements and led to the re-election of Defendants Mehrotra, Beyer, Dugle, Haynesworth, McCarthy, Switz, Wright, and himself to the Board, which allowed them to continue to breach their fiduciary duties to the Company. Defendant Gomo also solicited the 2024 Proxy Statement, which contained false and misleading statements and contributed to the re-election of Defendants Mehrotra, Beyer, Dugle, Haynesworth, McCarthy, Swan, Wright, and himself to the Board, which allowed them to continue to breach their fiduciary duties to the Company, and the approval of the 2025 Equity Incentive Plan. In addition, as a Company director, Defendant Gomo signed the false and misleading 2023 and 2024 10-Ks. Moreover, under the 2025 Equity Incentive Plan, Defendant Gomo is eligible to receive stock awards under the 2025 Equity Incentive Plan, thereby materially benefitting from the adoption of the 2025 Equity Incentive Plan. For these reasons, Defendant Gomo breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

145.    Additional reasons that demand on Defendant Haynesworth is futile follow. Defendant Haynesworth has served as a Company director since 2021. She also serves as the Chair of the Security Committee and as a member of the Audit Committee. Defendant Haynesworth has

received and continues to receive handsome compensation for her role as a director. As a trusted Company director, she conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded her duty to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duty to protect corporate assets. Furthermore, she solicited the 2023 Proxy Statement, which contained false and misleading statements and led to the re-election of Defendants Mehrotra, Beyer, Dugle, Gomo, McCarthy, Switz, Wright, and herself to the Board, which allowed them to continue to breach their fiduciary duties to the Company. Defendant Haynesworth also solicited the 2024 Proxy Statement, which contained false and misleading statements and contributed to the re-election of Defendants Mehrotra, Beyer, Dugle, Gomo, McCarthy, Swan, Wright, and herself to the Board, which allowed them to continue to breach their fiduciary duties to the Company, and the approval of the 2025 Equity Incentive Plan. In addition, as a Company director, Defendant Haynesworth signed the false and misleading 2023 and 2024 10-Ks. Moreover, under the 2025 Equity Incentive Plan, Defendant Haynesworth is eligible to receive stock awards under the 2025 Equity Incentive Plan, thereby materially benefitting from the adoption of the 2025 Equity Incentive Plan. For these reasons, Defendant Haynesworth breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

146.    Additional reasons that demand on Defendant McCarthy is futile follow. Defendant McCarthy has served as a Company director since 2018. She also serves as Chair of the Audit Committee and as a member of the Finance Committee. Defendant McCarthy has received and continues to receive handsome compensation for her role as a director. As a trusted Company director, she conducted little, if any, oversight of the scheme to cause the Company to make false

and misleading statements, consciously disregarded her duty to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duty to protect corporate assets. Furthermore, she solicited the 2023 Proxy Statement, which contained false and misleading statements and led to the re-election of Defendants Mehrotra, Beyer, Dugle, Gomo, Haynesworth, Switz, Wright, and herself to the Board, which allowed them to continue to breach their fiduciary duties to the Company. Defendant McCarthy also solicited the 2024 Proxy Statement, which contained false and misleading statements and contributed to the re-election of Defendants Mehrotra, Beyer, Dugle, Gomo, Haynesworth, Swan, Wright, and herself to the Board, which allowed them to continue to breach their fiduciary duties to the Company, and the approval of the 2025 Equity Incentive Plan. In addition, as a Company director, Defendant McCarthy signed the false and misleading 2023 and 2024 10-Ks. Moreover, under the 2025 Equity Incentive Plan, Defendant McCarthy is eligible to receive stock awards under the 2025 Equity Incentive Plan, thereby materially benefitting from the adoption of the 2025 Equity Incentive Plan. For these reasons, Defendant McCarthy breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

147.    Additional reasons that demand on Defendant Swan is futile follow. Defendant Swan has served as a Company director since March 2024. He also serves as a member of the Audit Committee and the Finance Committee. Defendant Swan has received and continues to receive handsome compensation for his role as a director. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duty to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duty to protect corporate assets.

Defendant Swan also solicited the 2024 Proxy Statement, which contained false and misleading statements and contributed to the re-election of Defendants Mehrotra, Beyer, Dugle, Gomo, Haynesworth, McCarthy, Wright, and himself to the Board, which allowed them to continue to breach their fiduciary duties to the Company, and the approval of the 2025 Equity Incentive Plan. In addition, as a Company director, Defendant Swan signed the false and misleading 2024 10-K. Moreover, under the 2025 Equity Incentive Plan, Defendant Swan is eligible to receive stock awards under the 2025 Equity Incentive Plan, thereby materially benefitting from the adoption of the 2025 Equity Incentive Plan. For these reasons, Defendant Swan breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

148.    Additional reasons that demand on Defendant Wright is futile follow. Defendant Wright has served as a Company director since 2019. She also serves as Chair of the Governance and Sustainability Committee and as a member of the Compensation Committee. Defendant Wright has received and continues to receive handsome compensation for her role as a director. As a trusted Company director, she conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded her duty to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duty to protect corporate assets. Furthermore, she solicited the 2023 Proxy Statement, which contained false and misleading statements and led to the re-election of Defendants Mehrotra, Beyer, Dugle, Gomo, Haynesworth, McCarthy, Switz, and herself to the Board, which allowed them to continue to breach their fiduciary duties to the Company. Defendant Wright also solicited the 2024 Proxy Statement, which contained false and misleading statements and contributed to the re-election of Defendants Mehrotra, Beyer, Dugle, Gomo, Haynesworth, McCarthy, Swan, and herself to the

Board, which allowed them to continue to breach their fiduciary duties to the Company, and the approval of the 2025 Equity Incentive Plan. In addition, as a Company director, Defendant Wright signed the false and misleading 2023 and 2024 10-Ks. Moreover, under the 2025 Equity Incentive Plan, Defendant Wright is eligible to receive stock awards under the 2025 Equity Incentive Plan, thereby materially benefitting from the adoption of the 2025 Equity Incentive Plan. For these reasons, Defendant Wright breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

149.    Additional reasons that demand on the Board is futile follow.

150.    Defendants McCarthy (as Chair), Gomo, Haynesworth, and Swan (the "Audit Committee Defendants") served as members of the Audit Committee at all relevant times. As such, they were responsible for the effectiveness of the Company's internal controls, the truth and accuracy of the Company's financial statements, and the Company's compliance with applicable laws and regulations. During the Relevant Period, they violated the Audit Committee Charter by engaging in or permitting the Company to engage in the dissemination of materially false and misleading statements to the public and to facilitate the Individual Defendants' violations of law, including breaches of fiduciary duty and violations of the Exchange Act; failed to adequately exercise their risk management and risk assessment functions; and failed to ensure adequate Board oversight of the Company's internal control over financial reporting, disclosure controls and procedures, and Code of Conduct. Thus, the Audit Committee Defendants breached their fiduciary duties, are not independent or disinterested, and thus demand is excused as to them.

151.    In violation of the Code of Conduct, the Director-Defendants engaged in or permitted the scheme to cause the Company to issue materially false and misleading statements to the public, and to facilitate and disguise the Individual Defendants' violations of law, including

breaches of fiduciary duty, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and violations of the Exchange Act. In violation of the Code of Conduct, the Director-Defendants failed to avoid conflicts of interest or the appearance of conflicts of interest; maintain the accuracy of Company records; protect and ensure the efficient use of Company assets; comply with all applicable laws, rules, and regulations; and properly report violations of the Code of Conduct and applicable laws, rules, and regulations. Thus, the Director-Defendants face a substantial likelihood of liability, and demand is futile as to them.

152.    Micron has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Director-Defendants have not filed any lawsuits against the Individual Defendants or others who were responsible for that wrongful conduct to attempt to recover for Micron any part of the damages Micron suffered and will continue to suffer thereby. Thus, any demand upon the Director-Defendants would be futile.

153.    The Individual Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Director-Defendants can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As a majority of the Director-Defendants face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and are not capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

154.    The acts complained of herein constitute violations of fiduciary duties owed by Micron's officers and directors, and these acts are incapable of ratification.

155.    The Director-Defendants may also be protected against personal liability for their

acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, i.e., monies belonging to the stockholders of Micron. If there is a directors' and officers' liability insurance policy covering the Director-Defendants, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Director-Defendants, known as, *inter alia*, the "insured-versus-insured exclusion." As a result, if the Director-Defendants were to sue themselves or certain of the officers of Micron, there would be no directors' and officers' insurance protection. Accordingly, the Director-Defendants cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Director-Defendants is futile and, therefore, excused.

156.    If there is no directors' and officers' liability insurance, then the Director-Defendants will not cause Micron to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability.  Accordingly, demand is futile in that event, as well.

157.    Thus, for all of the reasons set forth above, all of the Director-Defendants, and, if not all of them, at least four of the Directors, cannot consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

## FIRST CLAIM
### Against the Individual Defendants for Violations of
### Section 14(a) of the Exchange Act

158.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

COMPLAINT AND DEMAND FOR JURY TRIAL - 54

159.    Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

160.    Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. §240.14a-9.

161.    Under the direction and watch of Defendants Mehrotra, Beyer, Dugle, Gomo, Haynesworth, McCarthy, Switz, and Wright, the 2023 Proxy Statement failed to disclose, *inter alia*, that: (1) the demand for the Company's products in consumer markets, specifically the demand for the Company's NAND products, had significantly declined; (2) as a result, the amount Company's demand had recovered as was reported to investors was overstated, specifically the demand in consumer markets and for NAND products; (3) the sustainability of demand for these products, as well as the normalization of inventory for these products, was also overstated to investors; and (4) the Company failed to maintain internal controls. As a result of the foregoing, the Individual Defendants' statements about the Company's business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

162.    The 2023 Proxy Statement also failed to disclose that: (1) though the Company

claimed its officers and directors adhered to the Code of Conduct, the Individual Defendants violated these policies either without waivers or without such waivers being disclosed; and (2) contrary to the 2023 Proxy Statement's descriptions of the Board's and its committees' risk oversight functions, the Board and its committees were not adequately exercising these functions and were causing or permitting the Company to issue false and misleading statements.

163.    In the exercise of reasonable care, Defendants Mehrotra, Beyer, Dugle, Gomo, Haynesworth, McCarthy, Switz, and Wright should have known that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the 2023 Proxy Statement were materially false and misleading. The misrepresentations and omissions were material to Plaintiff in voting on matters set forth for shareholder determination in the 2023 Proxy Statement including, but not limited to, the election of directors.

164.    As a result of Defendants Mehrotra, Beyer, Dugle, Gomo, Haynesworth, McCarthy, Switz, and Wright causing the 2023 Proxy Statement to be false and misleading, Company shareholders voted, *inter alia*, to: (1) reelect Defendants Mehrotra, Beyer, Dugle, Gomo, Haynesworth, McCarthy, Switz, and Wright to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company; (2) approve executive compensation; (3) approve the frequency of future votes on executive compensation; and (4) ratify the appointment of PricewaterhouseCoopers LLP as the Company's independent registered public accounting firm for the 2024 Fiscal Year.

165.    Under the direction and watch of Defendants Mehrotra, Beyer, Dugle, Gomo, Haynesworth, McCarthy, Swan, Switz, and Wright, the 2024 Proxy Statement failed to disclose, *inter alia*, that: (1) the demand for the Company's products in consumer markets, specifically the demand for the Company's NAND products, had significantly declined; (2) as a result, the amount

Company's demand had recovered as was reported to investors was overstated, specifically the demand in consumer markets and for NAND products; (3) the sustainability of demand for these products, as well as the normalization of inventory for these products, was also overstated to investors; (4) the Company failed to maintain internal controls; and (5) the Individual Defendants were improperly interested in increasing their future compensation by seeking shareholder approval of the 2025 Equity Incentive Plan. As a result of the foregoing, the Individual Defendants' statements about the Company's business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

166.    The 2024 Proxy Statement also failed to disclose that: (1) though the Company claimed its officers and directors adhered to the Code of Conduct, the Individual Defendants violated these policies either without waivers or without such waivers being disclosed; and (2) contrary to the 2024 Proxy Statement's descriptions of the Board's and its committees' risk oversight functions, the Board and its committees were not adequately exercising these functions and were causing or permitting the Company to issue false and misleading statements.

167.    In the exercise of reasonable care, Defendants Mehrotra, Beyer, Dugle, Gomo, Haynesworth, McCarthy, Swan, Switz, and Wright should have known that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the 2024 Proxy Statement were materially false and misleading. The misrepresentations and omissions were material to Plaintiff in voting on matters set forth for shareholder determination in the 2024 Proxy Statement including, but not limited to, the election of directors and the approval of the 2025 Equity Incentive Plan.

168.    As a result of Defendants Mehrotra, Beyer, Dugle, Gomo, Haynesworth, McCarthy, Swan, Switz, and Wright causing the 2024 Proxy Statement to be false and misleading, Company

shareholders voted, *inter alia*, to: (1) reelect Defendants Mehrotra, Beyer, Dugle, Gomo, Haynesworth, McCarthy, Swan, and Wright to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company; (2) approve executive compensation; (3) approve the 2025 Equity Incentive Plan; and (4) ratify the appointment of PricewaterhouseCoopers LLP as the Company's independent registered public accounting firm for the 2025 Fiscal Year.

169.    The Company was damaged as a result of the Individual Defendants' material misrepresentations and omissions in the 2023 and 2024 Proxy Statements.

170.    Plaintiff, on behalf of Micron, has no adequate remedy at law.

## SECOND CLAIM
### Against the Individual Defendants for Violations of Section 20(a) of the Exchange Act

171.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

172.    The Individual Defendants, by virtue of their positions with Micron and their specific acts, were, at the time of the wrongs alleged herein, controlling persons of Micron and each of its officers and directors who made the false and misleading statements alleged herein within the meaning of §20(a) of the Exchange Act. The Individual Defendants had the power and influence and exercised the same to cause Micron to engage in the illegal conduct and practices complained herein.

173.    Plaintiff, on behalf of Micron, has no adequate remedy at law.

## THIRD CLAIM
### Against the Individual Defendants for Violations of Section 10(b) and Rule 10b-5 of the Exchange Act

174.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

175.    The Individual Defendants participated in a scheme to defraud with the purpose

and effect of defrauding Micron. Not only is Micron now defending claims that it violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, but the Company itself is also one of the largest victims of the unlawful scheme perpetrated upon Micron by the Individual Defendants. With the price of its common stock trading at artificially inflated prices due to the Individual Defendants' misconduct, the Individual Defendants caused the Company to repurchase *3,249,449* of its own shares at artificially inflated prices, damaging Micron.

176.    During the Relevant Period, the Individual Defendants also individually and in concert, directly and indirectly, by the use and means of instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct designed to falsify the Company's press releases, public statements made in earnings calls, and periodic and current reports filed with the SEC.

177.    The Individual Defendants employed devices, schemes, and artifices to defraud while in the possession of adverse, material, non-public information and engaged in acts, practices and a course of conduct that included the making of, or participation in the making of, untrue and/or misleading statements of material facts and/or omitting to state material facts necessary in order to make the statements made about Micron not misleading.

178.    The Individual Defendants as top executives and directors acted with scienter during the Relevant Period, in that they either had actual knowledge of the scheme and the misrepresentations and/or omissions of material facts set forth herein or acted with reckless disregard for the truth in that they failed to ascertain and to disclose the true facts, even though such facts were available to them. The Individual Defendants were the top executives of the Company, or received direct briefings from them, and were therefore directly responsible for the scheme set forth herein and for the false and misleading statements and/or omissions disseminated

to the public through filings with the SEC.

179.    By virtue of the foregoing, the Individual Defendants have violated §10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

**FOURTH CLAIM**
**Against the Individual Defendants for Breach of Fiduciary Duties**

180.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

181.    Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Micron's business and affairs.

182.    Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

183.    The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of Micron.

184.    In breach of their fiduciary duties owed to Micron, the Individual Defendants willfully or recklessly caused the Company to make false and/or misleading statements and/or omissions of material fact that failed to disclose, *inter alia*, that: (1) the demand for the Company's products in consumer markets, specifically the demand for the Company's NAND products, had significantly declined; (2) as a result, the amount Company's demand had recovered as was reported to investors was overstated, specifically the demand in consumer markets and for NAND products; (3) the sustainability of demand for these products, as well as the normalization of inventory for these products, was also overstated to investors; (4) the Company failed to maintain internal controls; and (5) the Individual Defendants were improperly interested in increasing their

future compensation by seeking shareholder approval of the 2025 Equity Incentive Plan. As a result of the foregoing, the Individual Defendants' statements about the Company's business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

185.    The Individual Defendants further failed to correct and/or caused the Company to fail to correct the false and misleading statements and/or omissions of material fact, which renders them personally liable to the Company for breaching their fiduciary duties.

186.    Also, in breach of their fiduciary duties, the Individual Defendants failed to maintain adequate internal controls.

187.    In yet further breach of their fiduciary duties, during the Relevant Period, the Individual Defendants willfully or recklessly caused the Company to repurchase approximately 3.2 million shares of its own common stock at artificially inflated prices before the fraud was exposed, while Defendant Mehrotra engaged in lucrative insider sales, netting proceeds of approximately $48.6 million.

188.    The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent scheme set forth herein and to fail to maintain internal controls. The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent scheme set forth herein and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of Micron's securities. The Individual Defendants, in good faith, should have taken appropriate action to correct the scheme alleged herein and to prevent it from

continuing to occur.

189.    These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

190.    As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Micron has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

191.    Plaintiff, on behalf of Micron, has no adequate remedy at law.

**FIFTH CLAIM**
**Against the Individual Defendants for Unjust Enrichment**

192.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

193.    By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, Micron.

194.    The Individual Defendants either benefitted financially from the improper conduct, or received bonuses, stock options, or similar compensation from Micron that was tied to the performance or artificially inflated valuation of Micron or received compensation or other payments that were unjust in light of the Individual Defendants' bad faith conduct.

195.    Plaintiff, as a shareholder and a representative of Micron, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, including from insider transactions, benefits, and other compensation, including any performance-based or valuation-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary duties.

196.    Plaintiff, on behalf of Micron, has no adequate remedy at law.

## SIXTH CLAIM
**Against the Individual Defendants for Abuse of Control**

197.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

198.    The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence Micron, for which they are legally responsible.

199.    As a direct and proximate result of the Individual Defendants' abuse of control, Micron has sustained significant damages. As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations of candor, good faith, and loyalty, Micron has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

200.    Plaintiff, on behalf of Micron, has no adequate remedy at law.

## SEVENTH CLAIM
**Against the Individual Defendants for Gross Mismanagement**

201.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

202.    By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of Micron in a manner consistent with the operations of a publicly held corporation.

203.    As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, Micron has sustained and will continue to sustain significant damages.

204.    As a result of the misconduct and breaches of duty alleged herein, the Individual

Defendants are liable to the Company.

205.    Plaintiff, on behalf of Micron, has no adequate remedy at law.

## EIGHTH CLAIM
### Against the Individual Defendants for Waste of Corporate Assets

206.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

207.    The Individual Defendants caused the Company to pay the Individual Defendants excessive salaries and fees, to the detriment of the shareholders and the Company.

208.    As a result of the foregoing, and by failing to properly consider the interests of the Company and its public shareholders, the Individual Defendants have caused Micron to waste valuable corporate assets, to incur many millions of dollars of legal liability and/or costs to defend unlawful actions, to engage in internal investigations, and to lose financing from investors and business from future customers who no longer trust the Company and its products.

209.    As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

210.    Plaintiff, on behalf of Micron, has no adequate remedy at law.

## SEVENTH CLAIM
### Against Defendants Mehrotra and Murphy for Contribution
### Under Sections 10(b) and 21D of the Exchange Act

211.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

212.    Micron and Defendants Mehrotra and Murphy are named as defendants in the Securities Class Action, which assert claims under the federal securities laws for violations of Sections 10(b) and 20(a) of the Exchange Act, and SEC Rule 10b-5 promulgated thereunder. If and when the Company is found liable in the Securities Class Action for these violations of the

COMPLAINT AND DEMAND FOR JURY TRIAL - 64

federal securities laws, the Company's liability will be in whole or in part due to Defendants Mehrotra's and Murphy's willful and/or reckless violations of their obligations as officers and/or directors of Micron.

213.    Defendants Mehrotra and Murphy, because of their positions of control and authority as officers and/or directors of Micron, were able to and did, directly and/or indirectly, exercise control over the business and corporate affairs of Micron, including the wrongful acts complained of herein and in the Securities Class Actions.

214.    Accordingly, Defendants Mehrotra and Murphy are liable under 15 U.S.C. § 78j(b), which creates a private right of action for contribution, and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f), which governs the application of a private right of action for contribution arising out of violations of the Exchange Act.

215.    As such, Micron is entitled to receive all appropriate contribution or indemnification from Defendants Mehrotra and Murphy.

## **PRAYER FOR RELIEF**

FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

(a)    Declaring that Plaintiff may maintain this action on behalf of Micron, and that Plaintiff is an adequate representative of the Company;

(b)    Declaring that the Individual Defendants have breached and/or aided and abetted the breach of their fiduciary duties to Micron;

(c)    Determining and awarding to Micron the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(d)    Directing Micron and the Individual Defendants to take all necessary

actions to reform and improve Micron's corporate governance and internal procedures to comply with applicable laws and to protect Micron and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws or Certificate of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

> 1. a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;
>
> 2. a provision to permit the shareholders of Micron to nominate at least four candidates for election to the Board; and
>
> 3. a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations.

(e)    Awarding Micron restitution from the Individual Defendants, and each of them;

(f)    Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

(g)    Granting such other and further relief as the Court may deem just and proper.

## **JURY DEMAND**

Plaintiff hereby demands a trial by jury.

Dated: February 20, 2025

Respectfully submitted,

**HEPWORTH HOLZER, LLP**

*/s/ Andrew J. LaPorta*
Andrew LaPorta, ISB No. 10483
537 W. Bannock Street
Boise, ID 83702
Telephone: (208) 343-7510
Facsimile: (208) 342-2927
Email: alaporta@hepworthholzer.com

**THE BROWN LAW FIRM, P.C.**
Timothy Brown
767 Third Avenue, Suite 2501
New York, NY 10017
Telephone: (516) 922-5427
Facsimile: (516) 344-6204
Email: tbrown@thebrownlawfirm.net

*Counsel for Plaintiff*

## **VERIFICATION**

      I, Ellen Maxwell, am a plaintiff in the within action. I have reviewed the allegations made in this Shareholder Derivative Complaint, know the contents thereof, and authorize its filing. To those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true.

      I declare under penalty of perjury that the foregoing is true and correct.  Executed this
6 __ day of February, 2025.


Ellen Maxwell